**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| XIN LI, derivatively on behalf of BLOCK, INC., | Case No. |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| JACK DORSEY, ROELOF BOTHA, AMY BROOKS, PAUL DEIGHTON, RANDY GARUTTI, JIM MCKELVEY, MARY MEEKER, NEHA NARULA, DAVID VINIAR, DARREN WALKER, SHARON ROTHSTEIN, ANNA PATTERSON, and AMRITA AHUJA, | DEMAND FOR JURY TRIAL |
| Defendants, | |
| and | |
| BLOCK, INC., | |
| Nominal Defendant. | |

1

Plaintiff Xin Li ("Plaintiff"), by and through Plaintiff's undersigned attorneys, derivatively on behalf of Nominal Defendant Block, Inc. ("Block" or the "Company"), brings this Verified Shareholder Derivative Complaint against Jack Dorsey ("Dorsey"), Roelof Botha ("Botha"), Amy Brooks ("Brooks"), Paul Deighton ("Deighton"), Randy Garutti ("Garutti"), Jim McKelvey ("McKelvey"), Mary Meeker ("Meeker"), Neha Narula ("Narula"), David Viniar ("Viniar"), Darren Walker ("Walker"), Sharon Rothstein ("Rothstein"), Anna Patterson ("Patterson"), and Amrita Ahuja ("Ahuja") (collectively, the "Individual Defendants" and, together with Block, "Defendants") for and among other things, their breaches of fiduciary duties and violations of the federal securities laws.

Plaintiff's allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief, including a review of publicly available information, including filings by Block with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought against certain Block officers and members of Block's Board of Directors (the "Board") that seeks to remedy wrongdoing committed by the Individual Defendants between February 26, 2020 and April 30, 2024, inclusive (the "Relevant Period").

2.      Block is a financial technology company. The Company's two primary products are Square, a financial services platform for small and medium-sized businesses, and Cash App (f/k/a "Square Cash"), a mobile payment service that allows users to transfer money using a mobile phone.

3.      During the Relevant Period, the Individual Defendants claimed that Block maintained effective compliance protocols and procedures to prevent use of the Company's platforms for illicit activities.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

4.    However, as a series of reports and articles revealed, in actuality, Block failed to implement even basic due diligence and know your customer ("KYC") protocols, effectively creating a haven for criminal and illicit activities on its platforms. Company customers used Block products to engage in money laundering, child sexual abuse, sex trafficking, drug trafficking, terrorism financing, contract killings, and illicit payments to entities and persons subject to economic sanctions.

5.    In light of the Individual Defendants' misconduct, the Company as well as Defendants Dorsey and Ahuja were named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California, captioned *Gonsalves v. Block, Inc., et al.*, 3:24-cv-00642 (N.D. Cal.) (the "Securities Class Action.") The Securities Class Action has further subjected Block to the need to undertake internal investigations and the need to implement adequate internal controls, as well as exposed the Company to massive class-wide liability.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b), 78n(a)) and SEC Rules 10b-5 and 14a-9 (17 C.F.R. §§ 240.10b-5, 240.14a-9). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

7.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC. §1367(a).

8.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

9.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Block's principal executive offices are located in this district, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## **PARTIES**

10.      Plaintiff is a current shareholder of Block and has continuously held Block stock at all relevant times.

11.      Nominal Defendant Block is a Delaware corporation and its principal executive offices are located at 1955 Broadway, Suite 600, Oakland, California 94612. The Company's common stock trades on NYSE under the ticker symbol "XYZ."

12.      Defendant Dorsey is a co-founder of Block and has served as a Company director since 2009 and as Chairperson of the Board since October 2010. Defendant Dorsey previously served as the Company's Chief Executive Officer ("CEO") and President from July 2009 until his title changed to Block Head as of April 2022. According to the proxy statement filed on Schedule 14A with the SEC on April 26, 2024 (the "2024 Proxy Statement"), as of March 31, 2024, Defendant Dorsey owned 1,000,000 shares of the Company's Class A Common Stock and 47,844,566 shares of the Company's Class B Common Stock, together amounting to 41.3% of total voting power within the Company. Defendant Dorsey is named as a defendant in the Securities Class Action.

13.      Defendant Ahuja has served as the Company's Chief Operating Officer ("COO") since February 2023 and as its Chief Financial Officer ("CFO") since January 2019. According to the 2024 Proxy Statement, for 2023, Defendant Ahuja received $16,548,981 in total compensation from the Company. As of March 31, 2024, Defendant Ahuja owned 330,711 shares of the Company's Class A Common Stock.

14.      Defendant McKelvey is a co-founder of Block and has served as a Company director since 2009. According to the 2024 Proxy Statement, for 2023, Defendant McKelvey received $289,720 in total compensation from the Company. As of March 31, 2024, Defendant McKelvey owned 131,527 shares of the Company's Class A Common Stock and 12,259,025

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

shares of the Company's Class B Common Stock, together amounting to 10.5% of total voting power within the Company.

15. Defendant Botha has served as a Company director since 2011. Defendant Botha serves as a member of the Board's Audit and Risk Committee and its Compensation Committee. According to the 2024 Proxy Statement, for 2023, Defendant Botha received $374,618 in total compensation from the Company. As of March 31, 2024, Defendant Botha owned 1,260,452 shares of the Company's Class A Common Stock.

16. Defendant Brooks has served as a Company director since 2019. Defendant Brooks serves as a member of the Board's Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, for 2023, Defendant Brooks received $292,220 in total compensation from the Company. As of March 31, 2024, Defendant Brooks owned 12,780 shares of the Company's Class A Common Stock.

17. Defendant Deighton has served as a Company director since 2016. Defendant Deighton serves as the Chair of the Board's Audit and Risk Committee and as a member of its Compensation Committee. According to the 2024 Proxy Statement, for 2023, Defendant Deighton received $314,959 in total compensation from the Company. As of March 31, 2024, Defendant Deighton owned 35,427 shares of the Company's Class A Common Stock.

18. Defendant Garutti has served as a Company director since 2017. Defendant Garutti serves as the Chair of the Board's Nominating and Corporate Governance Committee and as a member its Compensation Committee. According to the 2024 Proxy Statement, for 2023, Defendant Garutti received $299,959 in total compensation from the Company. As of March 31, 2024, Defendant Garutti owned 23,843 shares of the Company's Class A Common Stock.

19. Defendant Meeker has served as a Company director since 2011. Defendant Meeker serves as the Chair of the Board's Compensation Committee. According to the 2024 Proxy Statement, for 2023, Defendant Meeker received $304,642 in total compensation from the Company. As of March 31, 2024, Defendant Meeker owned 413,177 shares of the Company's Class A Common Stock.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

20.     Defendant Narula has served as a Company director since July 2023. Defendant Narula serves as a member of the Board's Audit and Risk Committee and as a member its Nominating and Corporate Governance Committee. According to the 2024 Proxy Statement, for 2023, Defendant Narula received $236,125 in total compensation from the Company. As of March 31, 2024, Defendant Narula owned 297 shares of the Company's Class A Common Stock.

21.     Defendant Rothstein served as a Company director from January 2022 until June 2024. According to the 2024 Proxy Statement, for 2023, Defendant Rothstein received $294,959 in total compensation from the Company.

22.     Defendant Patterson served as a Company director from 2017 until June 2022. According to the proxy statement filed on Schedule 14A with the SEC on April 28, 2023 (the "2023 Proxy Statement"), for 2022, Defendant Patterson received $35,595 in total compensation from the Company.

23.     Defendant Viniar served as a Company director from 2013 until June 2022. According to the 2023 Proxy Statement, for 2022, Defendant Viniar received $44,468 in total compensation from the Company.

24.     Defendant Walker served as a Company director from 2020 until August 2023. According to the 2023 Proxy Statement, for 2022, Defendant Walker received $292,784 in total compensation from the Company.

25.     Non-Party Anthony Eisen ("Eisen") has served as a Company Director since February 2025. As explained in the February 6, 2025 Form 8-K announcing his appointment to the Board, Eisen receives the Company's standard compensation for non-employee directors. Eisen is named herein solely for the purposes of demand futility.

26.     Non-Party Shawn Carter ("Carter") has served as a Company director since 2021. According to the 2024 Proxy Statement, for 2023, Carter received $289,720 in total compensation from the Company. As of March 31, 2024, Carter owned 38,073 shares of the Company's Class A Common Stock. Carter is named herein solely for the purposes of demand futility.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

27.    Defendants, Dorsey, McKelvey, Botha, Brooks, Deighton, Garutti, Meeker, Narula, Rothstein, Patterson, and Viniar are herein referred to as the "Proxy Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

28.    By reason of their positions as officers, directors, and/or fiduciaries of Block and because of their ability to control the business and corporate affairs of Block, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders.

29.    Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

30.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

31.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and

controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

32.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

## THE CODE OF BUSINESS CONDUCT AND ETHICS

33.     Block maintains a Code of Business Conduct and Ethics (the "Code of Conduct"), which states that it applies to all "employees, officers, and directors of Block."

34.     In a section titled "Financial Integrity & Accurate Records," the Code of Conduct provides as follows:

> The integrity of our business practices and financial information is paramount. Accurate, clear and complete records are essential to making the best business decisions, preserving our reputation for financial integrity and meeting our obligations as a public Company. In parallel, our shareholders and the financial markets rely on our full, fair, truthful, timely and understandable disclosures and financial information as well.

35.     In a section titled "Conflicts of Interest," the Code of Conduct provides as follows, in relevant part:

> A conflict of interest occurs when your personal interests are in potential conflict with your role and work at Block. You must avoid conflicts of interest, and if there is a situation that could present a potential conflict, or the appearance of conflict, you must disclose it to Block through the available channels below, so that it can be evaluated. Block does not expect, or encourage, employees to make a conflict-of-interest determination on their own.

## THE AUDIT AND RISK COMMITTEE CHARTER

36.     Block also maintains an Audit and Risk Committee Charter (the "Charter"). Which states that the purpose of the Audit and Risk Committee is to assist the Board in overseeing:

- The Company's accounting and financial reporting processes and internal controls as well as the auditing and integrity of the Company's financial statements.
- The qualifications and independence of the Company's independent registered public accounting firm (the "Independent Auditor").

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- The performance of the Company's Independent Auditor and internal audit function.

- The Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements). • Risk assessment and risk management pertaining to the financial, accounting and tax matters as well as data privacy and cybersecurity needs of the Company.

37.    In a section titled "Responsibilities," the Charter states the following responsibilities of the Audit and Risk Committee:

5. <u>Review Financial Statements.</u> The Audit and Risk Committee shall review and discuss the following with management and the Independent Auditor, as applicable:

- The scope and timing of the annual audit of the Company's financial statements.

- The Company's annual audited and quarterly financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations."

- The results of the independent audit and the quarterly reviews, and the Independent Auditor's opinion on the annual financial statements.

- The reports and certifications regarding internal control over financial reporting and disclosure controls and procedures.

- Major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles. • Analyses prepared by management or the Independent Auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements.

- The effect of regulatory and accounting initiatives on the Company's financial statements. Any significant changes required or taken in the audit plan as a result of any material control deficiency.

- Any problems or difficulties the Independent Auditor encountered in the course of its audit work, including any restrictions on the scope of the auditor's activities or on access to requested information, and management's response.

- Any significant disagreements between management and the Independent Auditor.

10

6. <u>Audited Financial Information; Audit and Risk Committee Report</u>. The Audit and Risk Committee shall recommend that the audited financial statements be included in the Company's annual reports on Form 10-K and shall prepare, review and approve the report of the Audit and Risk Committee that SEC rules require to be included in the Company's annual proxy statement.

\*    \*    \*

8. <u>Earnings Press Releases and Earnings Guidance</u>. The Audit and Risk Committee shall review and discuss (with particular attention to any use of non-GAAP financial measures) the Company's earnings press releases, shareholder letters, and financial information and earnings guidance provided to the public, analysts and ratings agencies.

9. <u>Internal Controls</u>. The Audit and Risk Committee shall review and discuss with management and the Independent Auditor the adequacy and effectiveness of the Company's internal controls, including any changes, significant deficiencies or material weaknesses in those controls reported by the Independent Auditor or management, any special audit steps adopted in light of significant control deficiencies, and any fraud, whether or not material, that involves management or other Company employees who have a significant role in the Company's internal controls.

10. <u>Disclosure Controls and Procedures</u>. The Audit and Risk Committee shall review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures.

\*    \*    \*

12. <u>Legal and Regulatory Compliance</u>. The Audit and Risk Committee shall:

- Oversee the review of any complaints and submissions that have been brought to the Audit and Risk Committee by the Company's Chief Legal Officer or Chief Compliance Officer (or equivalent titles thereof) under the Company's Code of Business Conduct and Ethics (the "Code");

- Review and discuss with management and the Independent Auditor (i) the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs, including compliance with the Foreign Corrupt Practices Act and foreign anti-corruption laws, and compliance with export control regulations, (ii) any reports received through the Company's reporting hotline and (iii) reports regarding compliance with applicable laws, regulations and internal compliance programs in each case to the extent pertaining to financial, accounting and/or tax matters;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Discuss with management and the Independent Auditor any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies; and

- Discuss with the Company's Chief Legal Officer legal matters that may have a material impact on the financial statements or the Company's compliance procedures that pertain to financial, accounting or tax matters of the Company. The Chief Compliance Officer shall meet with the Audit and Risk Committee regularly and at least quarterly. The Chief Compliance Officer shall have dotted line reporting to the Audit and Risk Committee. The Chief Compliance Officer shall have the authority to communicate directly to the Chair of the Audit and Risk Committee and the Audit and Risk Committee at any time.

## THE CORPORATE GOVERNANCE GUIDELINES

38.     Block maintains Corporate Governance Guidelines (the "Guidelines"), which state that the purpose of the Guidelines is to "assist the Board in the exercise of its responsibilities and to serve the interests of the Company and its stockholders in a manner that is consistent with its fiduciary duties."

39.     Under the heading "Conflicts of Interest," the Guidelines provide as follows:

Directors are expected to avoid any action, position or interest that conflicts with the interests of the Company or gives the appearance of a conflict. If an actual or potential conflict of interest develops, the director will report all facts regarding the matter to the Chief Legal Officer who will direct the matter to the Nominating Committee (or, if the conflict of interest constitutes a "related person transaction," to the Audit and Risk Committee). Any material conflict must be resolved or the director should resign. If a director has a personal interest in a matter before the Board, the director must disclose the interest to the Board, excuse themselves from discussion, and abstain from voting on the matter.

## SUBSTANTIVE ALLEGATIONS

### False and Misleading Statements Issued During the Relevant Period

40.     The Relevant Period begins on February 26, 2020, when the Company issued a letter to shareholders (the "February 2020 Letter"). The February 2020 Letter was signed by Defendants Dorsey and Ahuja and announced that, for the fourth quarter of 2019, Block saw 41% year-over-year total net revenue growth to $1.31 billion and 39% year-over-year gross profit

growth to $527 million. The February 2020 Letter further announced that, for the 2019 fiscal year, Block saw 43% year-over-year total net revenue growth to $4.71 billion and 45% year-over-year gross profit growth to $1.89 billion.

41.    The February 2020 Letter also announced that the Company's Square segment saw 26% year-over-year revenue growth to $938 million and 27% year-over-year gross profit growth to $379 million in the fourth quarter. Meanwhile, the Cash App segment saw 147% year-over-year revenue growth to $361 million and 104% year-over-year gross profit growth to $144 million in the fourth quarter. The February 2020 Letter then stated that Cash App had approximately 24 million monthly active customers in December 2019, achieving 60% year-over-year growth.

42.    That same day, the Company filed an annual report on Form 10-K with the SEC (the "2019 10-K"). The 2019 10-K was signed by Defendants Dorsey, Ahuja, Botha, Brooks, Deighton, Garutti, McKelvey, Meeker, Patterson, and Viniar. Appended to the 2019 10-K were certifications, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants Dorsey and Ahuja, attesting to the accuracy of the statements contained therein.

43.    The 2019 10-K stated that the Company had established a "compliance program" under which the Company and its employees "vet and monitor [the Company's] customers and the payments transactions we process for them as part of our risk management efforts." The 2019 10-K further stated that the Company had implemented an anti-money laundering ("AML") program designed to prevent money laundering, terrorist financing, and other illicit activity, stating in pertinent part as follows:

> We are subject to anti-money laundering (AML) laws and regulations in the United States and other jurisdictions. We have implemented an AML program designed to prevent our payments network from being used to facilitate money laundering, terrorist financing, and other illicit activity. Our program is also designed to prevent our network from being used to facilitate business in countries, or with persons or entities, included on designated lists promulgated by the U.S. Department of the Treasury's Office of Foreign Assets Controls and equivalent applicable foreign authorities. Our AML compliance program includes policies, procedures, reporting protocols, and internal controls, including the designation of an AML compliance officer, and is designed to address these legal and regulatory

requirements and to assist in managing risk associated with money laundering and terrorist financing.

44.     On May 6, 2020, the Company issued a shareholder letter (the "May 2020 Letter"). The May 2020 Letter was signed by Defendants Dorsey and Ahuja and announced that, for the first quarter of 2020, Block saw 44% year-over-year total net revenue growth to $1.38 billion and 36% year-over-year gross profit growth to $539 million. The May 2020 Letter also announced that the Square segment saw 16% year-over-year revenue growth to $853 million and 18% year-over-year gross profit growth to $356 million, while the Cash App segment saw 197% year-over-year revenue growth to $528 million and 115% year-over-year gross profit growth to $183 million.

45.     The May 2020 Letter further stated that, regarding April 2020, "Cash App delivered strong revenue and gross profit growth year over year, and saw its highest monthly totals for net-new transacting active customers, peer-to-peer volumes, Cash Card spend, Cash Card orders, direct deposit transacting active customers, bitcoin volumes, stock brokerage volumes, and stored funds."

46.     That same day, the Company filed a quarterly report on Form 10-Q with the SEC (the "May 2020 10-Q"). The May 2020 10-Q was signed by Defendants Dorsey and Ahuja. Appended to the May 2020 10-Q were SOX certifications, signed by Defendants Dorsey and Ahuja, attesting to the accuracy of the statements contained therein.

47.     The May 2020 10-Q reiterated that the Company had established a "compliance program" under which the Company and its employees "vet and monitor [the Company's] customers and the payments transactions we process for them as part of our risk management efforts."

48.     On August 4, 2020, the Company issued a shareholder letter (the "August 2020 Letter"). The August 2020 Letter was signed by Defendants Dorsey and Ahuja and announced that, for the second quarter of 2020, Block saw 64% year-over-year total net revenue growth to $1.92 billion and 28% year-over-year gross profit growth to $597 million. The August 2020 Letter

also announced that the Square segment saw quarterly revenue of $723 million and gross profit of $316 million, with both metrics negatively impacted by the onset of the COVID-19 pandemic. Meanwhile, the Cash App segment saw 361% year-over-year revenue growth to $1.2 billion and 167% year-over-year gross profit growth to $281 million. The August 2020 Letter also stated that, regarding June 2020, "Cash App had more than 30 million monthly transacting active customers, with more than 7 million spending on Cash Card."

49.    On August 5, 2020, the Company filed a quarterly report on Form 10-Q with the SEC (the "August 2020 10-Q"). The August 2020 10-Q was signed by Defendants Dorsey and Ahuja. Appended to the August 2020 10-Q were SOX certifications, signed by Defendants Dorsey and Ahuja, attesting to the accuracy of the statements contained therein.

50.    The August 2020 10-Q reiterated that the Company had established a "compliance program" under which the Company and its employees "vet and monitor [the Company's] customers and the payments transactions we process for them as part of our risk management efforts."

51.    On November 5, 2020, the Company issued a shareholder letter (the "November 2020 Letter"). The November 2020 Letter was signed by Defendants Dorsey and Ahuja and announced that, for the third quarter of 2020, Block saw 140% year-over-year total net revenue growth to $3.03 billion and 59% year-over-year gross profit growth to $794 million. The November 2020 Letter also announced that the Square segment saw 5% year-over-year revenue growth to $965 million and 12% year-over-year gross profit growth to $409 million. Meanwhile, the Cash App segment saw 574% year-over-year revenue growth to $2.07 billion and 212% year-over-year gross profit growth to $385 million. The November 2020 Letter also stated that, regarding the third quarter, "the number of average daily transacting active Cash App customers nearly doubled from the same period last year."

52.    That same day, the Company filed a quarterly report on Form 10-Q with the SEC (the "November 2020 10-Q"). The November 2020 10-Q was signed by Defendants Dorsey and

Ahuja. Appended to the November 2020 10-Q were SOX certifications, signed by Defendants Dorsey and Ahuja, attesting to the accuracy of the statements contained therein.

53.    The November 2020 10-Q reiterated that the Company had established a "compliance program" under which the Company and its employees "vet and monitor [the Company's] customers and the payments transactions we process for them as part of our risk management efforts."

54.    On January 4, 2021, the Company issued a press release (the "January 2021 Press Release") announcing that the Company took opposition to regulations proposed by the U.S. Department of the Treasury's Financial Crimes Enforcement Network to enhance KYC and due diligence requirements for the processing of cryptocurrency transactions. The January 2021 Press Release claimed that one of Block's "core principles" was "that people should have the ability to participate in financial systems easily and equitably."  The January 2021 Press Release then claimed that the Company had "invested substantially in the health of its ecosystem from a product, leadership, innovation, and legal perspective" rendering the proposed rules "unnecessary."  The release further claimed that the proposed rules would ultimately increase the risk of illicit activities and that "private sector solutions and companies" such as those offered by Block would better combat such risks. According to the January 2021 Press Release, Block's efforts and coordination with regulators had "prove[n] extraordinarily effective in identifying and stopping illicit activities."

55.    On February 23, 2021, the Company issued a shareholder letter (the "February 2021 Letter"). The February 2021 Letter was signed by Defendants Dorsey and Ahuja and announced that, for the fourth quarter of 2020, Block saw 141% year-over-year total net revenue growth to $3.16 billion and 52% year-over-year gross profit growth to $804 million, and that for the 2020 fiscal year, Block saw 101% year-over-year total net revenue growth to $9.5 billion and 45% year-over-year gross profit growth to $2.73 billion. The February 2021 Letter also announced that the Square segment saw 5% year-over-year revenue growth to $987 million and 13% year-over-year gross profit growth to $427 million in the fourth quarter. Meanwhile, the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Cash App segment saw 502% year-over-year revenue growth to $2.17 billion and 162% year-over-year gross profit growth to $377 million in the fourth quarter. The February 2021 Letter also stated that "Cash App continued to drive strong acquisition of new customers and retain its existing base: In December, Cash App had more than 36 million monthly transacting active customers, up more than 50% year over year."

56.    That same day, the Company filed an annual report on Form 10-K with the SEC (the "2020 10-K"). The 2020 10-K was signed by Defendants Dorsey, Ahuja, Botha, Brooks, Deighton, Garutti, McKelvey, Meeker, Patterson, Viniar, and Walker. Appended to the 2020 10-K were SOX certifications, signed by Defendants Dorsey and Ahuja, attesting to the accuracy of the statements contained therein.

57.    The 2020 10-K reiterated that the Company had established a "compliance program" under which the Company and its employees "vet and monitor [the Company's] customers and the payments transactions we process for them as part of our risk management efforts." The 2020 10-K also reiterated that the Company had implemented an AML program designed to prevent money laundering, terrorist financing, and other illicit activity, stating in pertinent part as follows:

> We are subject to anti-money laundering (AML) laws and regulations in the United States and other jurisdictions. We have implemented an AML program designed to prevent our payments network from being used to facilitate money laundering, terrorist financing, and other illicit activity. Our program is also designed to prevent our network from being used to facilitate business in countries, or with persons or entities, included on designated lists promulgated by the U.S. Department of the Treasury's Office of Foreign Assets Controls and equivalent applicable foreign authorities. Our AML compliance program includes policies, procedures, reporting protocols, and internal controls, including the designation of an AML compliance officer, and is designed to address these legal and regulatory requirements and to assist in managing risk associated with money laundering and terrorist financing.

58.    On May 6, 2021, the Company issued a shareholder letter (the "May 2021 Letter"). The May 2021 Letter was signed by Defendants Dorsey and Ahuja and announced that, for the first quarter of 2021, Block saw 266% year-over-year total net revenue growth to $5.06 billion

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and 79% year-over-year gross profit growth to $964 million. The May 2021 Letter also announced that the Square segment saw 19% year-over-year revenue growth to $1.02 billion and 32% year-over-year gross profit growth to $468 million. Meanwhile, the Cash App segment saw 666% year-over-year revenue growth to $4.04 billion and 171% year-over-year gross profit growth to $495 million. The May 2021 Letter also stated that "We continued to drive acquisition of net-new transacting active Cash App customers as well as engagement with Cash Card, Boost, direct deposit, stock brokerage, bitcoin investing, and business accounts."

59.    That same day, the Company filed a quarterly report on Form 10-Q with the SEC (the "May 2021 10-Q"). The May 2021 10-Q was signed by Defendants Dorsey and Ahuja. Appended to the May 2021 10-Q were SOX certifications, signed by Defendants Dorsey and Ahuja, attesting to the accuracy of the statements contained therein.

60.    The May 2021 10-Q reiterated that the Company had established a "compliance program" under which the Company and its employees "vet and monitor [the Company's] customers and the payments transactions we process for them as part of our risk management efforts."

61.    On August 1, 2021, the Company issued a shareholder letter (the "August 2021 Letter"). The August 2021 Letter was signed by Defendants Dorsey and Ahuja and announced that, for the second quarter of 2021, Block saw 143% year-over-year total net revenue growth to $4.68 billion and 91% year-over-year gross profit growth to $1.14 billion. The August 2021 Letter also announced that the Square segment saw 81% year-over-year revenue growth to $1.31 billion and 85% year-over-year gross profit growth to $585 million. Meanwhile, the Cash App segment saw 177% year-over-year revenue growth to $3.33 billion and 94% year-over-year gross profit growth to $546 million. The August 2021 Letter also stated that "volume sent through Cash App's network increased by nearly 4x compared to two years ago, driven by growth in existing customers and newer customers transacting more frequently."

62.    On August 2, 2021, the Company filed a quarterly report on Form 10-Q with the SEC (the "August 2021 10-Q"). The August 2021 10-Q was signed by Defendants Dorsey and

Ahuja. Appended to the August 2021 10-Q were SOX certifications, signed by Defendants Dorsey and Ahuja, attesting to the accuracy of the statements contained therein.

63.    The August 2021 10-Q reiterated that the Company had established a "compliance program" under which the Company and its employees "vet and monitor [the Company's] customers and the payments transactions we process for them as part of our risk management efforts."

64.    On November 4, 2021, the Company issued a shareholder letter (the "November 2021 Letter"). The November 2021 Letter was signed by Defendants Dorsey and Ahuja and announced that, for the third quarter of 2021, Block saw 27% year-over-year total net revenue growth to $3.84 billion and 43% year-over-year gross profit growth to $1.13 billion.. The November 2021 Letter also announced that the Square segment saw 44% year-over-year revenue growth to $1.39 billion and 48% year-over-year gross profit growth to $606 million. Meanwhile, the Cash App segment saw 16% year-over-year revenue growth to $2.39 billion and 33% year-over-year gross profit growth to $512 million. The November 2021 Letter also stated that "In October, we expect Cash App to deliver strong gross profit growth year over year and on a two-year CAGR basis driven by growth in monthly actives, engagement across our ecosystem, and inflows into Cash App."

65.    That same day, the Company filed a quarterly report on Form 10-Q with the SEC (the "November 2021 10-Q"). The November 2021 10-Q was signed by Defendants Dorsey and Ahuja. Appended to the November 2021 10-Q were SOX certifications, signed by Defendants Dorsey and Ahuja, attesting to the accuracy of the statements contained therein.

66.    The November 2021 10-Q reiterated that the Company had established a "compliance program" under which the Company and its employees "vet and monitor [the Company's] customers and the payments transactions we process for them as part of our risk management efforts."

67.    On February 24, 2022, the Company issued a shareholder letter (the "February 2022 Letter"). The February 2022 Letter was signed by Defendants Dorsey and Ahuja and

announced that, for the fourth quarter of 2021, Block saw 29% year-over-year total net revenue growth to $4.08 billion and 47% year-over-year gross profit growth to $1.18 billion, and that for the 2021 fiscal year, Block saw 86% year-over-year total net revenue growth to $17.66 billion and 62% year-over-year gross profit growth to $4.42 billion. The February 2021 Letter also announced that the Square segment saw 49% year-over-year revenue growth to $1.47 billion and 54% year-over-year gross profit growth to $657 million in the fourth quarter. Meanwhile, the Cash App segment saw 18% year-over-year revenue growth to $2.55 billion and 37% year-over-year gross profit growth to $518 million in the fourth quarter. The February 2021 Letter also stated that "We drove growth in net new transacting actives and strong engagement across products in our Cash App ecosystem."

68.     That same day, the Company filed an annual report on Form 10-K with the SEC (the "2021 10-K"). The 2021 10-K was signed by Defendants Dorsey, Ahuja, Botha, Brooks, Deighton, Garutti, McKelvey, Meeker, Patterson, Rothstein, Viniar, and Walker. Appended to the 2021 10-K were SOX certifications, signed by Defendants Dorsey and Ahuja, attesting to the accuracy of the statements contained therein.

69.     The 2021 10-K reiterated that the Company had established a "compliance program" under which the Company and its employees "vet and monitor [the Company's] customers and the payments transactions we process for them as part of our risk management efforts." The 2021 10-K also reiterated that the Company had implemented an AML program designed to prevent money laundering, terrorist financing, and other illicit activity, stating in pertinent part as follows:

> We are subject to anti-money laundering ("AML") laws and regulations in the United States and other jurisdictions. We have implemented an AML program designed to prevent our payments network from being used to facilitate money laundering, terrorist financing, and other illicit activity. Our program is also designed to prevent our network from being used to facilitate business in countries, or with persons or entities, included on designated lists promulgated by the U.S. Department of the Treasury's Office of Foreign Assets Controls and equivalent applicable foreign authorities. Our AML compliance program includes policies, procedures, reporting protocols, and internal controls, including the designation of an AML compliance officer, and is designed to address these legal and regulatory

requirements and to assist in managing risk associated with money laundering and terrorist financing.

70.    Also on February 24, 2022, the Company held an earnings call with investors and analysts. During the call, Defendant Dorsey stated the following regarding the Company's efforts to prevent fraud on Cash App:

> Well, I'll say that I think our biggest constraint right now is just how we think about building Cash App's risk and compliance efforts, everything that we see around fraud. We want to make sure that we are building a system that is scalable, that allows for limits for customers who might have more resources at their disposal and want to use Cash App for more and more things such as – as they would treat their normal bank.
>
> So we have limits in place to manage all these things, and a big goal for us is to make sure that we're looking for opportunities to increase those and to, at the same time, maintain all of the risk controls and fraud and continue to do what we've done so well over the years. And not just on the Cash App side, but on the Square side, keep it in our business forever.

71.    On May 5, 2022, the Company issued a shareholder letter (the "May 2022 Letter"). The May 2022 Letter was signed by Defendants Dorsey and Ahuja and announced that, for the first quarter of 2022, Block saw total net revenue of $3.96 billion, which was down 22% year over year due to a decrease in bitcoin revenue, and gross profit growth of 34% to $1.29 billion. The May 2022 Letter also announced that the Square segment saw 42% year-over-year revenue growth to $1.44 billion and 41% year-over-year gross profit growth to $661 million. Meanwhile, the Cash App segment saw revenue of $2.46 billion and gross profit growth of 26% to $624 million. The May 2022 Letter also stated that "we are focused on expanding our customers' awareness and access to bitcoin, which has allowed us to drive meaningful adoption: As of the end of the first quarter, more than 10 million Cash App accounts have bought bitcoin since the product was introduced."

72.    That same day, the Company filed a quarterly report on Form 10-Q with the SEC (the "May 2022 10-Q"). The May 2022 10-Q was signed by Defendants Dorsey and Ahuja.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Appended to the May 2022 10-Q were SOX certifications, signed by Defendants Dorsey and Ahuja, attesting to the accuracy of the statements contained therein.

73.     The May 2022 10-Q reiterated that the Company had established a "compliance program" under which the Company and its employees "vet and monitor [the Company's] customers and the payments transactions we process for them as part of our risk management efforts."

74.     On August 4, 2022, the Company issued a shareholder letter (the "August 2022 Letter"). The August 2022 Letter was signed by Defendants Dorsey and Ahuja and announced that, for the second quarter of 2022, Block saw total net revenue of $4.4 billion, which was down 6% year over year due to a decrease in bitcoin revenue, and gross profit growth of 29% to $1.47 billion. The August 2022 Letter also announced that the Square segment saw 32% year-over-year revenue growth to $1.73 billion and 29% year-over-year gross profit growth to $755 million. Meanwhile, the Cash App segment saw revenue of $2.62 billion and gross profit growth of 29% to $705 million. The August 2022 Letter also stated that "We drove growth in net new transacting actives and strong engagement across products in our Cash App ecosystem, such that overall inflows grew quarter over quarter and year over year."

75.     That same day, the Company filed a quarterly report on Form 10-Q with the SEC (the "August 2022 10-Q"). The August 2022 10-Q was signed by Defendants Dorsey and Ahuja. Appended to the August 2022 10-Q were SOX certifications, signed by Defendants Dorsey and Ahuja, attesting to the accuracy of the statements contained therein.

76.     The August 2022 10-Q reiterated that the Company had established a "compliance program" under which the Company and its employees "vet and monitor [the Company's] customers and the payments transactions we process for them as part of our risk management efforts."

77.     On November 3, 2022, the Company issued a shareholder letter (the "November 2022 Letter"). The November 2022 Letter was signed by Defendants Dorsey and Ahuja and announced that, for the third quarter of 2022, Block saw 17% year-over-year total net revenue

growth to $4.52 billion and 38% year-over-year gross profit growth to $1.57 billion. The November 2022 Letter also announced that the Square segment saw 27% year-over-year revenue growth to $1.77 billion and 29% year-over-year gross profit growth to $783 million. Meanwhile, the Cash App segment saw 12% year-over-year revenue growth to $2.68 billion and 51% year-over-year gross profit growth to $774 million. The November 2022 Letter also stated that "We drove growth in net new transacting actives and strong engagement across products in our Cash App ecosystem."

78.    That same day, the Company filed a quarterly report on Form 10-Q with the SEC (the "November 2022 10-Q"). The November 2022 10-Q was signed by Defendants Dorsey and Ahuja. Appended to the November 2022 10-Q were SOX certifications, signed by Defendants Dorsey and Ahuja, attesting to the accuracy of the statements contained therein.

79.    The November 2022 10-Q reiterated that the Company had established a "compliance program" under which the Company and its employees "vet and monitor [the Company's] customers and the payments transactions we process for them as part of our risk management efforts."

80.    On February 23, 2023, the Company issued a shareholder letter (the "February 2023 Letter"). The February 2023 Letter was signed by Defendants Dorsey and Ahuja and announced that, for the fourth quarter of 2022, Block saw 14% year-over-year total net revenue growth to $4.65 billion and 40% year-over-year gross profit growth to $1.66 billion, and that for the 2022 fiscal year, Block saw d $17.53 billion in total net revenue and 36% year-over-year gross profit growth to $5.99 billion. The February 2023 Letter also announced that the Square segment saw 19% year-over-year revenue growth to $1.76 billion and 22% year-over-year gross profit growth to $801 million in the fourth quarter. Meanwhile, the Cash App segment saw 12% year-over-year revenue growth to $2.68 billion and 64% year-over-year gross profit growth to $848 million in the fourth quarter. The February 2023 Letter also stated that "We ended the year with 51 million monthly transacting actives in December, with two out of three transacting each week on average."

81.    That same day, the Company filed an annual report on Form 10-K with the SEC (the "2022 10-K"). The 2022 10-K was signed by Defendants Dorsey, Ahuja, Botha, Brooks, Deighton, Garutti, McKelvey, Meeker, Patterson, Rothstein, Viniar, and Walker. Appended to the 2022 10-K were SOX certifications, signed by Defendants Dorsey and Ahuja, attesting to the accuracy of the statements contained therein.

82.    The 2022 10-K reiterated that the Company had established a "compliance program" under which the Company and its employees "vet and monitor [the Company's] customers and the payments transactions we process for them as part of our risk management efforts." The 2022 10-K also reiterated that the Company had implemented an AML program designed to prevent money laundering, terrorist financing, and other illicit activity, stating in pertinent part as follows:

> We are subject to anti-money laundering ("AML") laws and regulations in the United States and other jurisdictions. We have implemented an AML program designed to prevent our payments network from being used to facilitate money laundering, terrorist financing, and other illicit activity. Our program is also designed to prevent our network from being used to facilitate business in countries, or with persons or entities, included on designated lists promulgated by the U.S. Department of the Treasury's Office of Foreign Assets Controls and equivalent applicable foreign authorities. Our AML compliance program includes policies, procedures, reporting protocols, and internal controls, including the designation of an AML compliance officer, and is designed to address these legal and regulatory requirements and to assist in managing risk associated with money laundering and terrorist financing.

83.    The above statements were materially false and misleading and failed to disclose that: (1) the Individual Defendants neglected to sufficiently vet its customers' identities or the nature and legality of the transactions processed on the Company's platforms; (2) by failing to establish sufficiently rigorous obligations on new users, including allowing users to open accounts using fake identities, and by encouraging the use of bitcoin, the Individual Defendants allowed Square and Cash App to facilitate unlawful activities, including money laundering, child sexual abuse, sex trafficking, drug trafficking, terrorism financing, contract killings, and transactions in

violation of economic sanctions; (3) the Company allowed customers to withdraw funds even after the account had been flagged for potentially illegal activities; (4) due to the pervasiveness of fake and duplicative accounts on Cash App, the Company's publicly reported data regarding monthly Cash App users was artificially inflated; and (5) as a result of the foregoing, the Company was at heightened risk of regulatory scrutiny, and positive statements concerning the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis at all relevant times.

## THE TRUTH BEGINS TO EMERGE; FALSE AND MISLEADING STATEMENTS CONTINUE

84.    The truth began to emerge on March 23, 2023, when Hindenburg Research published an article titled "Block: How Inflated User Metrics and 'Frictionless' Fraud Facilitation Enabled Insiders To Cash Out Over $1 Billion" (the "Hindenburg Report"). As part of its research, the Hindenburg Report interviewed dozens of former Block employees, partners, and industry experts. The Hindenburg Report took aim at Block's "wild west" approach to compliance controls, concluding that the "'magic'" of Block's success had not been business innovation or its purported desire to serve legitimate unbanked communities, "but rather the company's willingness to facilitate fraud against consumers and the government, avoid regulation, dress up predatory loans and fees as revolutionary technology, and mislead investors with inflated metrics."

85.    The Hindenburg Report alleged that Block effectively courted criminal activity, making it "easy for bad actors to mass-create accounts for identity fraud and other scams, then extract stolen funds quickly." Former employees reportedly described how Cash App systemically suppressed internal concerns and ignored user pleas and numerous red flags to allow criminal activity to proliferate and fraud to run rampant on the platform and claimed that the Company strategically disregarded AML rules.  According to the Hindenburg Report: "Cash App's embrace of non-compliance begins by making it easy for users to get on the platform, easy

for them to get back on the platform if their accounts are closed, and easy to remain anonymous or operate under blatantly false identities."

86.    The Hindenburg Report also stated that permitting illegal and illicit activities—including sex trafficking, drug trafficking, consumer scams, COVID-19 relief fraud, and even contract killing payments—had allowed Block to artificially inflate its Cash App user metrics and artificially understate Cash App's customer acquisition costs.

87.    On this news, the price of Block Class A common stock declined almost 15%, from a closing price of $72.65 on March 22, 2023, to a closing price of $61.88 on March 23, 2023.

88.    That same day, the Company issued a press release (the "March 2023 Press Release") describing the Hindenburg Report as "factually inaccurate and misleading" and stating as follows:

> We intend to work with the SEC and explore legal action against Hindenburg Research for the factually inaccurate and misleading report they shared about our Cash App business today.

> Hindenburg is known for these types of attacks, which are designed solely to allow short sellers to profit from a declined stock price. We have reviewed the full report in the context of our own data and believe it's designed to deceive and confuse investors.

> We are a highly regulated public company with regular disclosures, and are confident in our products, reporting, compliance programs, and controls will not be distracted by typical short seller tactics.

89.    On May 4, 2023, the Company issued a shareholder letter (the "May 2023 Letter"). The May 2023 Letter was signed by Defendants Dorsey and Ahuja and announced that, for the first quarter of 2023, Block saw 26% year-over-year total net revenue growth to $4.99 billion and gross profit growth of 32% to $1.71 billion.. The May 2023 Letter also announced that the Square segment saw 26% year-over-year total net revenue growth to $4.99 billion and gross profit growth of 32% to $1.71 billion. Meanwhile, the Cash App segment saw 26% year-over-year total net revenue growth to $4.99 billion and gross profit growth of 32% to $1.71 billion. The May 2023

26

Letter also stated that "We drove growth in net new transacting actives and strong engagement across products in our Cash App ecosystem."

90.    That same day, the Company filed a quarterly report on Form 10-Q with the SEC (the "May 2022 10-Q"). The May 2022 10-Q was signed by Defendants Dorsey and Ahuja. Appended to the May 2022 10-Q were SOX certifications, signed by Defendants Dorsey and Ahuja, attesting to the accuracy of the statements contained therein.

91.    The May 2022 10-Q reiterated that the Company had established a "compliance program" under which the Company and its employees "vet and monitor [the Company's] customers and the payments transactions we process for them as part of our risk management efforts."

92.    Also on May 4, 2023, the Company hosted an earnings call with investors and analysts. During the call, Defendant Dorsey denied the allegations in the Hindenburg Report and stated: "I would say that we stand by our response to the shareholder report. . . . [Our] regulators trust us as well.  So this is a significant focus for us and always has been."

93.    During the same call, Defendant Ahuja claimed that Block maintained a robust culture of compliance, stating:

> Block operates a business that is highly regulated, and our goal is ultimately to expand access to the economy through intuitive financial products.  In order to do that, we must maintain a culture of compliance and responsible risk management, including through investment in programs, processes, controls and teams with deep compliance expertise, prioritizing compliance ultimately helps us drive trust to their customers with regulators and external partners, and that enables us to then develop innovative products responsibly.  We have significantly grown our investment in compliance over the last few years.

94.    On August 3, 2023, the Company issued a shareholder letter (the "August 2023 Letter"). The August 2023 Letter was signed by Defendants Dorsey and Ahuja and announced that, for the second quarter of 2023, Block saw 26% year-over-year total net revenue growth to $5.53 billion and gross profit growth of 27% to $1.87 billion. The August 2023 Letter also announced that the Square segment saw 12% year-over-year revenue growth to $1.93 billion and

18% year-over-year gross profit growth to $888 million. Meanwhile, the Cash App segment saw 36% year-over-year revenue growth to $3.56 billion and 37% year-over-year gross profit growth to $968 million. The August 2023 Letter also stated that "We drove growth in net new transacting actives and strong engagement across products in our Cash App ecosystem."

95.    That same day, the Company filed a quarterly report on Form 10-Q with the SEC (the "August 2023 10-Q"). The August 2023 10-Q was signed by Defendants Dorsey and Ahuja. Appended to the August 2023 10-Q were SOX certifications, signed by Defendants Dorsey and Ahuja, attesting to the accuracy of the statements contained therein.

96.    The August 2023 10-Q reiterated that the Company had established a "compliance program" under which the Company and its employees "vet and monitor [the Company's] customers and the payments transactions we process for them as part of our risk management efforts."

97.    The August 2023 10-Q also disclosed that the SEC and the U.S. Department of Justice ("DOJ") were investigating the allegations contained in the Hindenburg Report.

98.    On this news, the price of Block Class A common stock declined almost 14%, from a closing price of $73.55 on August 3, 2023, to a closing price of $63.52 on August 4, 2023.

99.    On November 2, 2023, the Company issued a shareholder letter (the "November 2023 Letter"). The November 2023 Letter was signed by Defendants Dorsey and Ahuja and announced that, for the third quarter of 2023, Block saw 24% year-over-year total net revenue growth to $5.62 billion and 21% year-over-year gross profit growth to $1.9 billion. The November 2023 Letter also announced that the Square segment saw 12% year-over-year revenue growth to $1.98 billion and 15% year-over-year gross profit growth to $899 million. Meanwhile, the Cash App segment saw 34% year-over-year revenue growth to $3.58 billion and 27% year-over-year gross profit growth to $984 million. The November 2023 Letter also stated that, regarding September 2023, "Cash App had 55 million monthly transacting actives, up 11% year over year."

100.    That same day, the Company filed a quarterly report on Form 10-Q with the SEC (the "November 2023 10-Q"). The November 2023 10-Q was signed by Defendants Dorsey and

Ahuja. Appended to the November 2023 10-Q were SOX certifications, signed by Defendants Dorsey and Ahuja, attesting to the accuracy of the statements contained therein.

101.    The November 2023 10-Q reiterated that the Company had established a "compliance program" under which the Company and its employees "vet and monitor [the Company's] customers and the payments transactions we process for them as part of our risk management efforts."

102.    The above statements were materially false and misleading and failed to disclose that: (1) the Individual Defendants neglected to sufficiently vet its customers' identities or the nature and legality of the transactions processed on the Company's platforms; (2) by failing to establish sufficiently rigorous obligations on new users, including allowing users to open accounts using fake identities, and by encouraging the use of bitcoin, the Individual Defendants allowed Square and Cash App to facilitate unlawful activities, including money laundering, child sexual abuse, sex trafficking, drug trafficking, terrorism financing, contract killings, and transactions in violation of economic sanctions; (3) the Company allowed customers to withdraw funds even after the account had been flagged for potentially illegal activities; (4) due to the pervasiveness of fake and duplicative accounts on Cash App, the Company's publicly reported data regarding monthly Cash App users was artificially inflated; and (5) as a result of the foregoing, the Company was at heightened risk of regulatory scrutiny, and positive statements concerning the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis at all relevant times.

## **THE TRUTH FULLY EMERGES**

103.    On February 16, 2024, NBC News published an article titled "Federal regulators are probing whether Cash App leaves door open to money launderers, terrorists" (the "February 2024 NBC Article"). The February 2024 NBC Article reported that two whistleblowers had alleged that Cash App performed inadequate due diligence on its users – including "'no effective

procedure to establish the[ir] identity'" – opening the door to potential money laundering, terrorism financing, and other illegal and illicit activities.  The whistleblowers detailed Cash App transactions with entities under sanction by the U.S. Department of the Treasury's Office of Foreign Assets Control, operations known to sell personal information and credit card data for illegal purposes, and offshore gambling sites barred to U.S. citizens.

104.    The February 2024 NBC Article further reported that the whistleblowers described Block as operating "'a shadow financial system beyond the reach of regulators.'" Cash App reportedly pressured its banking partners to forgo traditional due diligence and KYC steps with the express purpose of easing the process of account opening in order to generate revenues for Block.  In addition, the Company reportedly siloed parts of the transactions on Cash App from its banking partners, which prevented those partners from evaluating the entire nature of a transaction and thus impaired their ability to identify illegal or illicit activities.

105.    The February 2024 NBC Article then described Block's 2018 decision to allow bitcoin transactions on its platforms as exposing the Company's flawed customer due diligence to terrorist financing worldwide. The whistleblowers further described a vibrant market for opened Cash App accounts on the black market that reportedly allowed criminals to avoid even the minimum due diligence involved in setting up a new account.

106.    On this news, the price of Block Class A common stock declined more than 5%, from a closing price of $69.48 per share on February 15, 2024, to a closing price of $65.64 on February 16, 2024.

107.    On May 1, 2024, NBC News published an article titled "Federal prosecutors are examining financial transactions at Block, owner of Cash App and Square" (the "May 2024 NBC Article"). The May 2024 NBC Article reported that an employee had provided prosecutors with internal Company documents demonstrating that Block had failed to conduct basic due diligence on its customers, that Square had processed thousands of transactions involving countries subject to economic sanctions (including Cuba, Iran, Russia, and Venezuela), and that Block had processed multiple cryptocurrency transactions for terrorist groups.   The Company also

reportedly failed to properly report transactions to U.S. regulatory authorities, and failed to correct compliance deficiencies even after being alerted to the breaches.  Reportedly, documents turned over by the whistleblower showed that these violations were known by both the senior management of the Company and the Board.  According to this former employee: "'From the ground up, everything in the compliance section was flawed . . . .  It is led by people who should not be in charge of a regulated compliance program.'"

108.    The May 2024 NBC Article also described woefully deficient compliance practices, such as allowing customers subject to a sanctions alert to withdraw funds before the alert review was complete or failing to screen against sanctions keyword lists.  In addition, the employee rejected Block's contention that it had voluntarily reported thousands of suspicious transactions, stating that Block had excluded thousands of other transactions that the Company had failed to report.  The article also stated that Block had hired an outside consultant in 2023 who identified nearly 50 instances of deficiencies in the Company's internal systems for monitoring suspicious activities.  In addition, the former employee rejected Block's contention that it had voluntarily reported thousands of suspicious transactions, stating that there were in fact thousands of other transactions that the Company had failed to report.  Collectively, the two reports by NBC News corroborated the allegations contained in the Hindenburg Report and directly contradicted defendants' prior denials.

109.    On this news, the price of Block Class A common stock declined more than 8%, from a closing price of $73 on April 30, 2024, to a closing price of $66.84 per share on May 1, 2024.

110.    On January 15, 2025, a coalition of 48 state regulatory agencies announced that Block had agreed to pay $80 million for violations of the Bank Secrecy Act and AML laws.   As part of that agreement, the Company agreed to correct ongoing deficiencies, submit to the review of an independent consultant regarding its compliance lapses, and submit a progress report to the states within nine months.

111.    On January 16, 2025, the CFPB ordered Block to refund and pay other redress to consumers up to $120 million and a penalty of $55 million into the CFPB's victims relief fund. The CFPB found that Block employed weak security protocols for Cash App that put users at risk of fraud and then attempted to avoid its investigative obligations and attempted to use fine print to escape its legal requirements. When it did conduct investigations, the CFPB found that Block used intentionally shoddy investigation practices to close reports of unauthorized transactions in the Company's favor.  According to the CFPB, Block also deprived Cash App users of meaningful and effective customer service and left the network vulnerable to criminals defrauding users. Consumers looking for an alternate route to Cash App customer service through web searches were targeted by fraudsters posing as Cash App representatives, who tricked them into giving up their passwords and other personal information. The CFPB found that Block knew that its customers were being targeted by fraudsters in this way but failed to take timely action to address the issue. In addition to monetary penalties, Block was also ordered to cure deficiencies in its customer service and support functions.

## THE INDIVIDUAL DEFENDANTS CAUSED THE COMPANY TO ISSUE FALSE AND MISLEADING PROXY STATEMENTS

112.    On April 28, 2022, the Company filed a proxy statement on Schedule 14A with the SEC (the "2022 Proxy Statement"). The 2022 Proxy Statement was solicited by Defendants Dorsey, Botha, Brooks, Deighton, McKelvey, Garutti, Meeker, Rothstein, and Walker and sought shareholder approval for: (1) the re-election of Defendants Dorsey and Deighton to serve for another three-year term on the Board; and (2) the compensation of certain of the Company's executive officers.

113.    With respect to the Company's risk management controls, the 2022 Proxy Statement contained the following language:

> Our board of directors recognizes the oversight of risk management as one of its primary responsibilities and central to maintaining an effective, risk aware and accountable organization. The oversight responsibility of our board of directors

and its committees is enabled by management reporting processes that are designed to provide visibility to our board of directors regarding the identification, assessment and management of risks and management's strategic approach to risk mitigation. Our Lead Independent Director and Chair of our audit and risk committee meets with our Internal Audit Lead, Chief Financial Officer, Chief Compliance Officer and Chief Legal Officer on a regular cadence to identify and discuss risks and exposures and escalates potential issues to our audit and risk committee or board of directors, as appropriate.

As part of our overall risk management process, we conduct an Enterprise Risk Assessment ("ERA") on an annual basis, which is shared and discussed with our board of directors. The oversight of the ERA is supported and enabled by our audit and risk committee. In addition, our board of directors' responsibilities related to oversight of the ERA framework include a routine evaluation of the processes, as well as discussions with key management and representatives of outside advisors as appropriate, used to identify, assess, monitor and report on risks across the organization and the setting and communication of the organization's implementation and measurement of risk tolerances, limits and mitigation. These primary risk focus areas are defined by the board of directors, management and leaders of our ERA review as strategic, operational, people, financial and compliance and consist of risks such as cybersecurity, financial reporting and competition.

While our board of directors maintains ultimate responsibility for the oversight of risk, it has implemented a multi-layered approach which delegates certain responsibilities to the appropriate board committees to ensure that these primary areas of focus are thoroughly discussed and that a pervasive understanding of such focus areas is obtained. Our board of directors and its committees oversee risks associated with their respective areas of responsibility, as summarized below. Each board committee meets in executive session with key management personnel and representatives of outside advisors as required or requested. Our board of directors may delegate additional risk areas in the future.

114.    With respect to the Audit and Risk Committee's oversight functions, the 2022 Proxy Statement contained the following statement:

Risks and exposures associated with financial matters, particularly financial reporting, tax, accounting, disclosure controls and procedures, internal control over financial reporting, investment guidelines and credit and liquidity matters, our programs and policies relating to legal and regulatory compliance, data privacy, data security, cybersecurity and operational security and reliability, as well as matters of risk related to Square Financial Services.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

115.    With respect to the Board's obligations under the Code of Conduct, the 2022 Proxy Statement stated the following:

> Our board of directors has adopted Corporate Governance Guidelines that address items such as the qualifications and responsibilities of our directors and director candidates, including independence standards and corporate governance policies and standards applicable to us in general. In addition, our board of directors has adopted a Code of Business Conduct and Ethics that applies to all of our employees, officers and directors, including our Block Head, Chief Financial Officer and other executive and senior financial officers. The full text of our Corporate Governance Guidelines and our Code of Business Conduct and Ethics is posted on our investor relations website at https://investors.block.xyz. We will post amendments to our Corporate Governance Guidelines and our Code of Business Conduct and Ethics or any waivers of our Code of Business Conduct and Ethics for directors and executive officers on the same website.

116.    As a result of the 2022 Proxy Statement, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Dorsey and Deighton to the Board; and (2) approve the compensation of certain of the Company's executive officers.

117.    On April 28, 2023, the Company filed the 2023 Proxy Statement. The 2023 Proxy Statement was solicited by Defendants Dorsey, Botha, Brooks, Deighton, McKelvey, Garutti, Meeker, Rothstein, and Walker and sought shareholder approval for: (1) the re-election of Defendants Botha, Brooks, and McKelvey to the Board; and (2) the compensation of certain of the Company's executive officers.

118.    With respect to the Company's risk management controls, the 2023 Proxy Statement contained the following language:

> Our board of directors recognizes the oversight of risk management as one of its primary responsibilities and central to maintaining an effective, risk-aware and accountable organization. The oversight responsibility of our board of directors and its committees is supported by management reporting processes that are designed to provide visibility to our board of directors regarding the identification, assessment and management of risks and management's strategic approach to risk mitigation. Our Lead Independent Director and Chair of our audit and risk committee meet with our Internal Audit Lead, Chief Financial Officer, Chief Compliance Officer and Chief Legal Officer on a regular cadence to identify and discuss risks and exposures, and escalate potential issues to our audit and risk committee or board of directors, as appropriate.

As part of our overall risk management process, we conduct an annual Enterprise Risk Assessment ("ERA"), which is shared and discussed with our board of directors. Oversight of the ERA is supported and enabled by our audit and risk committee. Our board of directors' oversight of the ERA framework includes a routine evaluation, with discussions with key management and outside advisors, as appropriate, of the processes used to identify, assess, monitor and report on risks across the organization and the setting and communication of the organization's implementation and measurement of risk tolerances, limits and mitigation. Our board of directors, management and functional leaders of our ERA define our primary risk focus area for review. These areas include strategic, operational, people, financial and compliance. We address risks such as cybersecurity, financial reporting and competition within each of these areas.

While our board of directors maintains ultimate responsibility for the oversight of risk, it has implemented a multi-layered approach that delegates certain responsibilities to the appropriate board committees to ensure that these primary areas of focus are discussed in detail and that a full understanding of the applicable risk is obtained. Our board of directors and its committees oversee risks associated with their respective areas of responsibility, as summarized below. Each board committee meets in executive session with key management personnel and representatives of outside advisors as required or requested. Our board of directors may delegate additional risk areas to its committees in the future.

119.    With respect to the Audit and Risk Committee's oversight functions, the 2023 Proxy Statement contained the following statement:

Risks and exposures associated with financial matters, particularly financial reporting, tax, accounting, disclosure controls and procedures, internal control over financial reporting, investment guidelines and credit and liquidity matters, our programs and policies relating to legal and regulatory compliance, data privacy, data security, cybersecurity and operational security and reliability, as well as matters of risk related to Square Financial Services.

120.    With respect to the Board's obligations under the Code of Conduct, the 2023 Proxy Statement stated the following:

Our board of directors has adopted Corporate Governance Guidelines that address items such as the qualifications and responsibilities of our directors and director candidates and the responsibilities of members of committees of our board of directors. In addition, our board of directors has adopted a Code of Business Conduct and Ethics that applies to all of our employees, officers and directors,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

including our Block Head, Chief Financial Officer and other executive and senior financial officers. The full texts of our Corporate Governance Guidelines and our Code of Business Conduct and Ethics are posted on our investor relations website at https://investors.block.xyz. We will post amendments to our Corporate Governance Guidelines and our Code of Business Conduct and Ethics and any waivers of our Code of Business Conduct and Ethics for directors and executive officers on the same website.

121.    As a result of the 2023 Proxy Statement, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Botha, Brooks, and McKelvey to the Board; and (2) approve the compensation of certain of the Company's executive officers.

122.    On April 26, 2024, the Company filed the 2024 Proxy Statement. The 2024 Proxy Statement was solicited by Defendants Dorsey, Botha, Brooks, Deighton, McKelvey, Garutti, Meeker, Rothstein, and Narula and sought shareholder approval for: (1) the re-election of Defendants Garutti and Meeker to the Board; and (2) the compensation of certain of the Company's executive officers.

123.    With respect to the Company's risk management controls, the 2024 Proxy Statement contained the following language:

> Our board of directors recognizes the oversight of risk management as one of its primary responsibilities and central to maintaining an effective, risk-aware and accountable organization. The oversight responsibility of our board of directors and its committees is supported by management reporting processes that are designed to provide visibility to our board of directors regarding the identification, assessment and management of risks and management's strategic approach to risk mitigation. The Chair of our audit and risk committee meets with our Internal Audit Lead, Chief Financial Officer, Chief Compliance Officer and Chief Legal Officer on a regular cadence to identify and discuss risks and exposures, and escalate potential issues to our audit and risk committee or board of directors, as appropriate.
>
> As part of our overall risk management process, we conduct an annual Enterprise Risk Assessment ("ERA"), which is shared and discussed with our board of directors. Oversight of the ERA is supported and enabled by our audit and risk committee. Our board of directors' oversight of the ERA framework includes a routine evaluation, with discussions with key management and outside advisors, as appropriate, of the processes used to identify, assess, monitor and report on risks across the organization and the setting and communication of the organization's

implementation and measurement of risk tolerances, limits and mitigation. Our board of directors, management and functional leaders of our ERA define our primary risk focus areas for review. These areas include strategic, operational, people, financial and compliance. We address risks such as cybersecurity, financial reporting and competition within each of these areas.

While our board of directors maintains ultimate responsibility for the oversight of risk, it has implemented a multi-layered approach that delegates certain responsibilities to the appropriate board committees to ensure that these primary areas of focus are discussed in appropriate detail and that a full understanding of the applicable risk is obtained. Our board of directors and its committees oversee risks associated with their respective areas of responsibility, as summarized below. Each board committee meets in executive session with key management personnel and representatives of outside advisors as required or requested. Our board of directors may delegate additional risk areas to its committees in the future.

124.    With respect to the Audit and Risk Committee's oversight functions, the 2024 Proxy Statement contained the following statement:

Risks and exposures associated with financial matters, particularly financial reporting, tax, accounting, disclosure controls and procedures, internal control over financial reporting, investment guidelines and credit and liquidity matters, our programs and policies relating to legal and regulatory compliance, data privacy, data security, cybersecurity and operational security and reliability, as well as matters of risk related to Square Financial Services.

125.    With respect to the Board's obligations under the Code of Conduct, the 2023 Proxy Statement stated the following:

Our board of directors has adopted Corporate Governance Guidelines that address items such as the qualifications and responsibilities of our directors and director candidates and the responsibilities of members of committees of our board of directors. In addition, our board of directors has adopted a Code of Business Conduct and Ethics that applies to all of our employees, officers and directors, including our Block Head, Chief Financial Officer and other executive and senior financial officers. The full texts of our Corporate Governance Guidelines and our Code of Business Conduct and Ethics are posted on our investor relations website at https://investors.block.xyz. We will post amendments to our Corporate Governance Guidelines and our Code of Business Conduct and Ethics and any waivers of our Code of Business Conduct and Ethics for directors and executive officers on the same website.

126.     As a result of the 2024 Proxy Statement, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Dorsey and Deighton to the Board; and (2) approve the compensation of certain of the Company's executive officers.

127.     The 2022, 2023, and 2024 Proxy Statements were materially false and misleading because, despite statement to the contrary, the Individual Defendants failed to abide by the Code of Conduct by: (i) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (ii) failing to report violations of the Code of Conduct. In addition, The 2022, 2023, and 2024 Proxy Statements were materially false and misleading because, despite statements to the contrary, the Board had not adequately performed its risk oversight functions.

128.     Moreover, the 2022, 2023, and 2024 Proxy Statement failed to disclose that: (1) the Individual Defendants neglected to sufficiently vet its customers' identities or the nature and legality of the transactions processed on the Company's platforms; (2) by failing to establish sufficiently rigorous obligations on new users, including allowing users to open accounts using fake identities, and by encouraging the use of bitcoin, the Individual Defendants allowed Square and Cash App to facilitate unlawful activities, including money laundering, child sexual abuse, sex trafficking, drug trafficking, terrorism financing, contract killings, and transactions in violation of economic sanctions; (3) the Company allowed customers to withdraw funds even after the account had been flagged for potentially illegal activities; (4) due to the pervasiveness of fake and duplicative accounts on Cash App, the Company's publicly reported data regarding monthly Cash App users was artificially inflated; (5) as a result of the foregoing, the Company was at heightened risk of regulatory scrutiny, and positive statements concerning the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis at all relevant times.

### THE INDIVIDUAL DEFENDANTS CAUSED BLOCK TO REPURCHASE THE COMPANY'S COMMON STOCK AT ARTIFICIALLY INFLATED PRICES

129.    During the Relevant Period, Block repurchased shares of its own Class A common stock at artificially inflated prices, causing substantial damage to the Company. In total, the Company expended over $346 million repurchasing over 4.6 million shares of its own Class A common stock at prices that did not reflect the actual value of the stock. As a result, Block overpaid for repurchases during the relevant period by approximately $32.6 million.

130.    According to the 2023 10-K, between December 1, 2023 and December 31, 2023, the Company repurchased 1,121,000 shares of its own Class A common stock for a total approximate cost of $97,431,800, or an average price of $72.44. Given that the Company's stock was actually worth only $66.84 per share,[1] Block overpaid for those repurchases by approximately $7,532,000.

131.    According to the quarterly report filed on Form 10-Q on May 2, 2024 (the "May 2024 10-Q"), between February 1, 2024 and February 29, 2024, the Company repurchased 1,104,000 shares of its own Class A common stock for a total approximate cost of $74,542,080, or an average price of $67.52. Given that the Company's stock was actually worth only $66.84 per share, Block overpaid for those repurchases by approximately $750,720.

132.    According to the May 2024 10-Q, between March 1, 2024 and March 31, 2024, the Company repurchased 956,000 shares of its own Class A common stock for a total approximate cost of $77,110,960, or an average price of $80.66. Given that the Company's stock was actually worth only $66.84 per share, Block overpaid for those repurchases by approximately $13,211,920.

133.    According to the quarterly report filed on Form 10-Q on August 1, 2024, between April 1, 2024 and April 30, 2024, the Company repurchased 1,287,000 shares of its own Class A common stock for a total approximate cost of $97,181,370, or an average price of $75.51. Given that the Company's stock was actually worth only $66.84 per share, Block overpaid for those repurchases by approximately $11,158,290.

### DAMAGES TO BLOCK

---

[1] The price at the close of trading on May 1, 2024, once the truth had fully emerged.

134.    As a direct and proximate result of the Individual Defendants' misconduct, Block has expended and will continue to expend many millions of dollars.

135.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

136.    Such expenditures will also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

137.    As a direct and proximate result of the Individual Defendants' conduct, Block has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

138.    Plaintiff brings this action derivatively in the right of and for the benefit of Block to redress injuries suffered, and to be suffered, as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, violations of federal law, waste of corporate assets, and other wrongful conduct as alleged herein.

139.    Block is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

140.    Plaintiff is an owner of Block stock and has been a continuous shareholder of Company stock at all relevant times.

141.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

142.    A pre-suit demand on the Board is futile and therefore, excused. At the time this suit was filed, the Board consisted of the following ten individuals: Defendants Botha, Brooks,

Deighton, Dorsey, Garutti, McKelvey, Meeker, and Narula (the "Director Defendants"), as well as Non-Partis Eisen and Carter. Plaintiff is required to show that a majority of the current Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

143.    Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

144.    The Director Defendants either knew or should have known of the false and misleading statements and omissions that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that misconduct.

145.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and, with gross negligence, disregarded the wrongs complained of herein and are therefore not disinterested parties.

146.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements and omissions, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

147.    Additional reasons that demand on Defendant Dorsey is futile follow. Defendant Dorsey is a co-founder of Block and has served as a Company director since 2009 and as Chairperson of the Board since October 2010. Defendant Dorsey previously served as the Company's Chief Executive Officer ("CEO") and President from July 2009 until his title changed to Block Head as of April 2022. Thus, as the Company admits in the 2024 Proxy Statement, Defendant Dorsey is a non-independent director. The Company provides Defendant Dorsey with

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

his principal occupation for which he receives significant equity compensation as detailed above. Defendant Dorsey authorized his signature on the 2019, 2020, 2021, and 2022 10-Ks, and solicited the 2022, 2023, and 2024 Proxy Statements, each of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. Defendant Dorsey is a defendant in the Securities Class Action and thus, faces potential liability. For these reasons, Defendant Dorsey breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

148.    Additional reasons that demand on Defendant McKelvey is futile follow. Defendant McKelvey is a co-founder of Block and has served as a Company director since 2009. The Company provides Defendant McKelvey with significant compensation as detailed above. Defendant McKelvey authorized his signature on the 2019, 2020, 2021, and 2022 10-Ks, and solicited the 2022, 2023, and 2024 Proxy Statements, each of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant McKelvey breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

149.    Additional reasons that demand on Defendant Botha is futile follow. Defendant Botha has served as a Company director since 2011. The Company provides Defendant Botha with significant compensation as detailed above. Defendant Botha authorized his signature on the 2019, 2020, 2021, and 2022 10-Ks, and solicited the 2022, 2023, and 2024 Proxy Statements, each of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons,

Defendant Botha breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

150.    Additional reasons that demand on Defendant Brooks is futile follow. Defendant Brooks has served as a Company director since 2019. The Company provides Defendant Brooks with significant compensation as detailed above. Defendant Brooks authorized her signature on the 2019, 2020, 2021, and 2022 10-Ks, and solicited the 2022, 2023, and 2024 Proxy Statements, each of which contained false and misleading statements. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Brooks breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon her is futile and, therefore, excused.

151.    Additional reasons that demand on Defendant Deighton is futile follow. Defendant Deighton has served as a Company director since 2016. The Company provides Defendant Deighton with significant compensation as detailed above. Defendant Deighton authorized his signature on the 2019, 2020, 2021, and 2022 10-Ks, and solicited the 2022, 2023, and 2024 Proxy Statements, each of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Deighton breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

152.    Additional reasons that demand on Defendant Garutti is futile follow. Defendant Garutti has served as a Company director since 2017. The Company provides Defendant Garutti with significant compensation as detailed above. Defendant Garutti authorized his signature on the 2019, 2020, 2021, and 2022 10-Ks, and solicited the 2022, 2023, and 2024 Proxy Statements, each of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading

statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Garutti breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

153.    Additional reasons that demand on Defendant Meeker is futile follow. Defendant Meeker has served as a Company director since 2011. The Company provides Defendant Meeker with significant compensation as detailed above. Defendant Meeker authorized her signature on the 2019, 2020, 2021, and 2022 10-Ks, and solicited the 2022, 2023, and 2024 Proxy Statements, each of which contained false and misleading statements. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Meeker breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon her is futile and, therefore, excused.

154.    Additional reasons that demand on Defendant Narula is futile follow. Defendant Narula has served as a Company director since 2023. The Company provides Defendant Narula with significant compensation as detailed above. Defendant Narula solicited the 2024 Proxy Statements, which contained false and misleading statements. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Narula breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon her is futile and, therefore, excused.

155.    Additional reasons that demand on Carter is futile follow. Carter has served as a member of the Board since 2021. The Company provides Carter with significant compensation as detailed above. As such, Carter cannot independently or impartially consider any demand adverse to the Director Defendants serving on the Compensation Committee who determine Carter's compensation. Carter therefore could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Carter is thus futile.

156.    Additional reasons that demand on Eisen is futile follow. Eisen has served as a member of the Board since February 2025. The Company provides Eisen with significant compensation as detailed above. As such, Eisen cannot independently or impartially consider any demand adverse to the Director Defendants serving on the Compensation Committee who determine Eisen's compensation. Eisen therefore could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Eisen is thus futile.

157.    Defendants Botha, Deighton, and Narula serve as members of the Audit and Risk Committee and/or served as members of the Audit and Risk Committee during the Relevant Period and, pursuant to the Audit and Risk Committee Charter, were specifically charged with, *inter alia*, the responsibility of assisting the Board in fulfilling its oversight responsibilities related to internal controls over financial reporting and public disclosure requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding material deficiencies in the Company's accounting practices and the adequacy of the Company's internal controls as alleged above. Therefore, Defendants Botha, Deighton, and Narula cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

158.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to Block's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

159.    The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

160.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

161.    Publicly traded companies, such as Block, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

162.    Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, therefore, excused.

## COUNT ONE

### Against the Proxy Defendants for Violations of Section 14(a) of the Exchange Act

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

163.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

164.    The Proxy Defendants solicited the 2022, 2023, and 2024 Proxy Statements containing materially false and misleading statements and/or omissions.

165.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

166.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a- 9.

167.    Under the direction and watch of the Proxy Defendants, the 2022, 2023, and 2024 Proxy Statements failed to disclose that: (i) the Individual Defendants made and/or caused the Company to make the false and misleading statements and omissions alleged herein; and (ii) the Board failed to adequately carry out its risk management and oversight obligations and failed to adhere to the Code of Conduct.

168.    The 2022, 2023, and 2024 Proxy Statements also failed to disclose that: : (1) the Individual Defendants neglected to sufficiently vet its customers' identities or the nature and legality of the transactions processed on the Company's platforms; (2) by failing to establish sufficiently rigorous obligations on new users, including allowing users to open accounts using fake identities, and by encouraging the use of bitcoin, the Individual Defendants allowed Square and Cash App to facilitate unlawful activities, including money laundering, child sexual abuse,

sex trafficking, drug trafficking, terrorism financing, contract killings, and transactions in violation of economic sanctions; (3) the Company allowed customers to withdraw funds even after the account had been flagged for potentially illegal activities; (4) due to the pervasiveness of fake and duplicative accounts on Cash App, the Company's publicly reported data regarding monthly Cash App users was artificially inflated; and (5) as a result of the foregoing, the Company was at heightened risk of regulatory scrutiny, and positive statements concerning the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis at all relevant times.

169.    In exercise of reasonable care, the Proxy Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022, 2023, and 2024 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination.

170.    The Company was damaged as a result of the Proxy Defendants' material misrepresentations and omissions in the 2022, 2023, and 2024 Proxy Statements.

171.    Plaintiff on behalf of Block has no adequate remedy at law.

## **COUNT TWO**

**Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

172.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

173.    The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

174.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to

disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

175.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Block not misleading.

176.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Block.

177.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were directly responsible for the false and misleading statements and omissions disseminated to the public through press releases and filings with the SEC.

178.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Block, their control over, and/or receipt and/or modification of Block's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Block, participated in the fraudulent scheme alleged herein.

179.    As a result of the foregoing, the market price of Block common stock was artificially inflated during the relevant time period. In ignorance of the falsity of the statements, Plaintiff, relied on the statements described above and/or the integrity of the market price of Block

common stock in purchasing Block common stock at prices that were artificially inflated as a result of these false and misleading statements and was damaged thereby.

180. By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

181. Plaintiff, on behalf of Block, has no adequate remedy at law.

## COUNT THREE

### Against the Individual Defendants for Breach of Fiduciary Duties

182. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

183. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Block's business and affairs.

184. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

185. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Block.

186. In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

187. In further breach of their fiduciary duties owed to Block, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) the Individual Defendants neglected to sufficiently vet its customers' identities or the nature and legality of the transactions processed on the Company's platforms; (2) by failing to establish sufficiently rigorous obligations on new users, including allowing users to open accounts using fake identities, and by encouraging the use of bitcoin, the Individual Defendants allowed Square and Cash App to facilitate unlawful activities, including money laundering, child sexual abuse, sex trafficking, drug trafficking,

terrorism financing, contract killings, and transactions in violation of economic sanctions; (3) the Company allowed customers to withdraw funds even after the account had been flagged for potentially illegal activities; (4) due to the pervasiveness of fake and duplicative accounts on Cash App, the Company's publicly reported data regarding monthly Cash App users was artificially inflated; and (5) as a result of the foregoing, the Company was at heightened risk of regulatory scrutiny, and positive statements concerning the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis at all relevant times.

188.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

189.   The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

190.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

191.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

192.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Block has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

193.    Plaintiff on behalf of Block has no adequate remedy at law.

## COUNT THREE

### Against the Individual Defendants for Unjust Enrichment

194.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

195.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Block.

196.    The Individual Defendants either benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Block that was tied to the performance or artificially-inflated valuation of Block or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

197.    Plaintiff, as a shareholder and a representative of Block, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

198.    Plaintiff on behalf of Block has no adequate remedy at law.

## COUNT FOUR

52

**Against the Individual Defendants for Waste of Corporate Assets**

199.    Plaintiff incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

200.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

201.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (1) paying excessive compensation, bonuses, and termination payments to certain of its executive officers, as detailed, *supra*; and (2) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle the Securities Class Action, addressing the Individual Defendants' unlawful action.

202.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

203.    Plaintiff, on behalf of Block, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Block and that Plaintiff is a proper and adequate representative of the Company;

B.    Against all of the Defendants and in favor of Block for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

C.    Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D.    Awarding Block restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E.    Awarding Plaintiff the costs and disbursements of this action, including reasonable

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   attorneys' and expert fees and expenses; and

2       F.     Granting such other and further equitable relief as this Court may deem just

3   and

4       proper.

5

6                                    **JURY DEMAND**

7   Plaintiff hereby demands a trial by jury.

8   Dated: April 17, 2025                Respectfully submitted,

9                                        **THE ROSEN LAW FIRM, P.A.**

10                                       /s/Laurence M. Rosen

11                                       Laurence M. Rosen, Esq. (SBN 219683)
                                         355 South Grand Avenue, Suite 2450
12                                       Los Angeles, CA 90071
                                         Telephone: (213) 785-2610
13                                       Facsimile: (213) 226-4684
                                         Email: lrosen@rosenlegal.com
14

15                                       *Counsel for Plaintiff*

16

17

18

19

20

21

22

23

24

25

26

27

28
                                            54

## **<u>VERIFICATION</u>**

I, Xin Li am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I declare under penalty of perjury that the foregoing is true and correct. Executed this 4/14/2025.

Xin Li